UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
|    Plaintiff, | § | |
| | § | |
| v. | § | CRIMINAL NO. 3:19-CR-0580-B |
| | § | |
| CLIFTON SNEED (1) a/k/a CLIFTON | § | |
| CURTIS SNEED, a/k/a CLIFTON | § | |
| CURTIS SNEED JR., a/k/a KAISAN | § | |
| SNEED, and MARVA SNEED (2), | § | |
| | § | |
|    Defendants. | § | |

## MEMORANDUM OPINION & ORDER

Before the Court are Defendant Marva Sneed ("Marva")'s Motion to Exclude Testimony (Doc. 73) and Motion for Severance (Doc. 74), Defendant Clifton Sneed ("Clifton")'s Motion to Dismiss the Indictment (Doc. 75), and Marva's Motion for Joinder to Clifton's Motion to Dismiss the Indictment (Doc. 76). For the reasons that follow, the Court **GRANTS** Marva's Motion for Joinder and **DENIES** the Motion to Exclude Testimony, Motion for Severance, and Motion to Dismiss the Indictment.

## I.

## BACKGROUND

On November 6, 2019, Clifton and Marva Sneed (collectively, the "Sneeds") were indicted on one count of conspiracy to commit wire fraud, five counts of wire fraud, and one count of securities fraud. *See* Doc. 1, Indictment, 3, 6, 8 (alleging violations of 18 U.S.C. § 1349; 18 U.S.C. § 1343; 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2). The indictment alleges that Clifton and Marva "created and marketed fraudulent investment groups called The Joint

- 1 -

Venture Group (TJVG), LDI Holdings, and The Trade Group as a paid membership, that would allow investors to invest in investment platforms," resulting in a $1.5 million loss to investors. *Id.* ¶¶ 3, 8.

Count One of the indictment alleges an investment scheme whereby an investor purchases a membership in an investment group and subsequently purchases investments offered to members. *Id.* ¶ 11. The Sneeds marketed these investments through TJVG and LDI Holdings from July 2014 to approximately August 2015 and through The Trade Group from August 2015 to January 2019 using various events, websites, emails, phone calls, and documents. *Id.* ¶¶ 13–14. After representing that an investment would create "a three hundred percent return in ninety days, and that a five thousand dollar investment would compound to fifteen million in just three years," the Sneeds "directed investors to pay a non-refundable 'investment fee' of up to $20,000.00 in order to become a member of TJVG, LDI Holdings, and The Trade Group." *Id.* ¶¶ 15–16. The Sneeds would then direct investors to fund their investment by transmitting "a minimum of $2,500.00 to an international bank account." *Id.* ¶ 16. Investors never received investment returns or a refund of their investments. *Id.* ¶ 17.

Counts Two through Six of the indictment allege that the Sneeds caused five individuals to wire amounts ranging from $10,000 to $60,000 to a bank with the intent to defraud the investors. *Id.* ¶ 19. The separate counts provide the date and amount of the transfer, initials of the investor, and the bank that received the wire transfer. *See id.*

Count Seven of the indictment alleges that the Sneeds committed securities fraud through misrepresentations and omissions. *Id.* ¶¶ 22–23. The numerous alleged misrepresentations included statements about the expected returns, security of the returns, investment groups' reputability, the

Sneeds' personal qualifications, proprietary technology, and investment group membership size. *Id.* ¶ 22. The alleged omissions included the failure to notify investors about several cease-and-desist orders for the sale and offer of securities, a final judgment for fraud by the Securities and Exchange Commission ("SEC"), a tax lien by the Department of the Treasury, use of a pseudonym "Kaisan" Sneed for Clifton, and failing to disclose investors' issues with the investment groups. *Id.* ¶ 23.

Pending before the Court are (1) Clifton's Motion to Dismiss the Indictment, (2) Marva's Motion for Joinder to Clifton's Motion, (3) Marva's Motion to Exclude Testimony, and (4) Marva's Motion for Severance. All briefing has been received for each motion, and as such, they are ripe for review.

## II.

## LEGAL STANDARDS

A.      *Rule 12(b)(3)(B) Standard*

Federal Rule of Criminal Procedure 7(c)(1) provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged ." "The purpose of an indictment is 'to allege each essential element of the offense charged so as to enable the accused to prepare his defense and to allow the accused to invoke the double jeopardy clause in any subsequent proceeding.'" *United States v. Lawrence*, 727 F.3d 386, 397 (5th Cir. 2013) (quoting *United States v. Morrow*, 177 F.3d 272, 296 (5th Cir. 1999)). "Allegations made in one count may be incorporated by reference in another count." *United States v. Stanford*, 805 F.3d 557, 567 (5th Cir. 2015) (citing Fed. R. Crim. P. 7(c)(1)). "Thus, an indictment is sufficient if it 'contains the elements of the offense charged and fairly informs the defendant of the charge against which he must defend.'" *Lawrence*, 727 F.3d 386 at 397 (quoting *United States v. Fuller*, 974 F.2d 1474, 1480 (5th Cir. 1992)).

"Generally, an indictment [that] follows the language of the statute under which it is brought is sufficient to give a defendant notice of the crime of which he is charged." *United States v. USPlabs, LLC*, 338 F. Supp. 3d 547, 557 (N.D. Tex. 2018) (alteration in original) (quoting *United States v. Thomas*, 348 F.3d 78, 82 (5th Cir. 2003)). "It is not necessary for an indictment to go further and to allege in detail the factual proof that will be relied upon to support the charges." *Id.* (quoting *United States v. Crippen*, 579 F.2d 340, 342 (5th Cir. 1978)).

A defendant may move to dismiss an indictment under Rule 12(b)(3)(B) of the Federal Rules of Criminal Procedure. "[A] motion to dismiss an indictment for failure to state an offense is a challenge to the sufficiency of the indictment. . . ." *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004). "When the court decides such a motion, it is required to 'take the allegations of the indictment as true and to determine whether an offense has been stated.'" *United States v. Daniels*, 316 F. Supp. 3d 949, 953 (N.D. Tex. 2018) (quoting *Kay*, 359 F.3d at 742). "The propriety of granting a motion to dismiss an indictment . . . by pretrial motion is by-and-large contingent upon whether the infirmity in the prosecution is essentially one of law or involves determinations of fact[.]" *Id.* (quoting *United States v. Fontenot*, 665 F.3d 640, 644 (5th Cir. 2011)). "A court must deny a motion to dismiss if the motion relies on disputed facts." *USPlabs*, 338 F. Supp. 3d at 557 (citing, inter alia, *United States v. Covington*, 395 U.S. 57, 60 (1969)).

B.    *Exclusion of Testimony Standard*

"In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. CONST. amend. VI. The Confrontation Clause "bars the introduction of testimonial evidence against a criminal defendant unless the proponent shows both that the declarant is unavailable and that the defendant had 'a prior opportunity for cross-

examination.'" *United States v. Ceballos*, 789 F.3d 607, 613–14 (5th Cir. 2015) (quoting *Crawford v. Washington*, 541 U.S. 36, 68 (2004)). Testimony is "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Crawford*, 541 U.S. at 51.

C.      *Severance Standard*

Rule 8(b) of the Federal Rules of Criminal Procedure permits defendants to be charged together "if they are alleged to have participated in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Rule 14(a) permits a court to sever defendants if joinder "appears to prejudice a defendant or the government." "There is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). A prima facie case for severance to introduce the exculpatory testimony of a co-defendant requires a defendant to show: "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant would in fact testify if a severance was granted." *United States v. Broussard*, 80 F.3d 1025, 1037 (5th Cir. 1996).

## III.

## ANALYSIS

The Court addresses all four motions below. First, the Court addresses the Motion for Joinder to Dismiss the Indictment, followed by the Motion to Dismiss the Indictment, the Motion for Severance, and lastly, the Motion to Exclude Testimony. Finding that Marva and Clifton are "similarly situated," the Court **GRANTS** Marva's Motion for Joinder. However, Clifton and Marva fail to satisfy the requirements to dismiss the indictment, sever the trial, or exclude Clifton's statements to the SEC. Therefore the Court **DENIES** the three remaining motions.

A.     *Motion for Joinder to the Motion to Dismiss the Indictment*

Marva filed a Motion for Joinder to the Motion to Dismiss the Indictment. *See* Doc. 76, Mot. Joinder, 1. A court will allow a party to join the motion of another party when "(1) the parties are so similarly situated that filing an independent motion would be redundant, or (2) the party seeking joinder" identifies the specific motion, the basis for standing, and factual similarities between the claims or defenses. *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1151 (C.D. Cal. 2016).

The Court finds Clifton and Marva are "similarly situated," making an independent motion redundant. *See id.* Both stand accused of the same crimes, from the same scheme, in the same indictment. *See* Doc. 1, Indictment. Accordingly, the Court **GRANTS** the motion. Therefore, the Court treats the Motion to Dismiss the Indictment as if filed by Clifton and Marva.

B.     *Motion to Dismiss the Indictment*

The indictment should include specific and identifiable characteristics so as to be neither vague nor indefinite. *Stanford*, 805 F.3d at 567. To survive a motion to dismiss, the indictment must (1) "enumerate[] each prima facie element of the charged offense[;]" (2) "notif[y] the defendant of the charges filed against him[;] and" (3) "provide[] the defendant with a double jeopardy defense against future prosecutions." *United States v. Suarez*, 966 F.3d 376, 382 (5th Cir. 2020) (alterations in original) (emphasis omitted) (quoting *United States v. Nevers*, 7 F.3d 59, 62 (5th Cir. 1993). For the first prong, the "indictment must state each element of the charged crime and allege that the defendant's conduct met each of those elements." *Id.*

The Court will address the arguments for dismissing Counts One through Six before addressing the arguments for dismissing Count Seven.

1.      Counts One Through Six

Clifton moves to dismiss the indictment for Counts One through Six because the allegations fail to identify "what representations made pursuant to the scheme were false, [or] in what way." Doc. 75, Mot. Dismiss Indictment, 2. This alleged shortcoming fails to provide Clifton adequate notice to prepare an adequate defense and contest the elements of the offense. *Id.* at 3–4. Specifically, Clifton avers that "[t]he only arguable misrepresentation in counts one through six is [his] statement that . . . investors would quickly double their funds." *Id.* at 4. However, Clifton argues, the indictment fails to allege that he knew the statement to be false and therefore fails to allege all the elements of the offense. *Id.*

The Government contends that the indictment alleges all three elements for Count 1—conspiracy to commit wire fraud—because the indictment alleges (1) the Sneeds "and others known and unknown to the Grand Jury"; (2) "knowingly execute[d] or attempt[ed] to execute a scheme or artifice to defraud investors in [the investment groups]"; and (3) "unlawfully, knowingly, and willfully combined, conspired, confederated, and agree with each other to commit wire fraud." Doc. 79, Gov't's Resp., 3–4 (quoting Doc. 1, Indictment, ¶¶ 10–17). For Counts Two through Six—wire fraud—the Government argues that the indictment alleges all three elements: (1) incorporates the scheme alleged in Count One; (2) "describe[s] which defendant . . . participated in that particular count, the date of the wire, the victim initials, the bank and its location, and the amount of the wire;" and (3) alleges the Sneeds acted "knowingly and with the intent to defraud." *Id.* at 4–5 (citing Doc. 1, Indictment, ¶¶ 1–19).

The Court will address Count One first and then address Counts Two through Six collectively.

i.      *Count One—Conspiracy to Commit Wire Fraud*

Section 1349 reads "[a]ny person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy." 18 U.S.C. § 1349. The elements of conspiracy to commit wire fraud under 18 U.S.C. § 1349 are "(1) two or more persons made an agreement to commit wire fraud; (2) the defendant knew the unlawful purpose of the agreement; and (3) the defendant joined in the agreement willfully, that is, with the intent to further the unlawful purpose." *United States v. Bryant*, 854 F. App'x 572, 573 (5th Cir. 2021) (per curiam) (quotations omitted).

For the first element of a conspiracy, the indictment alleges Clifton and Marva "agreed . . . to execute a scheme" to defraud investors. Doc. 1, Indictment, ¶ 10. For the second element, the indictment alleges the Sneeds knowingly agreed to defraud the investors. *Id.* And for the third element, the indictment alleges that the Sneeds willfully entered the agreement to commit the scheme. *Id.* Therefore, the indictment alleges each of the elements for conspiracy to commit wire fraud in Count One. These allegations sufficiently notify the Sneeds of the charge against them that they can prepare a defense. The indictment also identifies the scheme with enough particularity to prevent any threat of double jeopardy to the Sneeds. The Court **DENIES** the motion for Count One of the indictment.

ii.      *Counts Two through Six—Wire Fraud*

For wire fraud under 18 U.S.C. § 1343, the elements are "(1) a scheme to defraud; (2) the use of, or causing the use of, wire communications in furtherance of the scheme; and (3) a specific intent to defraud." *Bryant*, 854 F. App'x at 573 (quotations omitted). Section 1343 reads:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses,

representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

As for the wire fraud elements, the indictment identifies the scheme under the header "Scheme and Artifice to Defraud" and outlines the names of the Sneeds's investment groups, their marketing methods, their alleged representation of the expected investment returns, how the Sneeds directed investors to wire the funds and in what amounts, and the investors' lack of receipt of funds. *Id.* ¶¶ 13–17. The indictment further identifies the alleged dates, amounts, initials of the investor, the bank, and the particular defendant that directed the investor to wire the funds for each separate count of wire fraud. *Id.* ¶ 19; *cf. United States v. Howard*, 2005 WL 8157701, at *3 (S.D. Tex. Apr. 18, 2005) (finding the indictment sufficient when it "clearly set[] forth the date, origin and destination, and description of the use of the wires charged in each count"). For the final element of wire fraud and the crux of Clifton's argument, the indictment alleges the Sneeds knowingly and willfully committed the scheme to defraud investors. Doc. 1, Indictment, ¶ 10. An indictment that alleges defendants acted knowingly and willfully sufficiently alleges intent. *See United States v. Kent*, 608 F.2d 542, 545 n.3 (5th Cir. 1979); *see also United States v. Akpan*, 407 F.3d 360, 370 (5th Cir. 2005) ("[A] defendant acts with the intent to defraud when he acts knowingly with the specific intent to deceive for the purpose of causing pecuniary loss to another or bringing about some financial gain to himself.") (internal quotation marks omitted). Further, "specific intent to defraud need not be charged in the Indictment." *United States v. Brown*, 459 F.3d 509, 519 (5th Cir. 2006).

The indictment alleges each of the elements for wire fraud in Counts Two through Six. These allegations, especially the details of each alleged count for wire fraud, notifies the Sneeds of the

charges against them so the Sneeds can properly prepare a defense against each count. Lastly, the indictment identifies the scheme with enough particularity to prevent any threat of double jeopardy to the Sneeds. Thus, the Court **DENIES** the Motion to Dismiss the Indictment for Counts Two through Six.

> 2.    Count Seven[1]: Violation of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5

Section 78j(b)[2] "proscribes (1) using any deceptive device (2) in connection with the purchase or sale of securities, in contravention of rules prescribed by the Commission." *United States v. O'Hagan*, 521 U.S. 642, 651 (1997). The Securities Act of 1933 defines the term "security"[3] and the definition includes an "investment contract." 15 U.S.C. § 77b(a)(1). In the seminal case *S.E.C. v. W.J. Howey*, the Supreme Court defined an investment contract as "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party." 328 U.S. 293, 298–99 (1946). Thus, an investment

---

[1] Count Seven includes violations of 15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2, but Clifton's motion only mentions 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5. The Court therefore construes the motion to only pertain to 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5.

[2] Section 78j(b) reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b) (footnote omitted).

[3] "[S]ecurity" means any note, stock, treasury stock, . . . investment contract, . . . any interest or instrument commonly known as a 'security', or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.

15 U.S.C. § 77b(a)(1).

contract requires "(1) an investment of money; (2) in a common enterprise; and (3) on an expectation of profits to be derived solely from the efforts of individuals other than the investor." *Williamson v. Tucker*, 645 F.2d 404, 417–18 (5th Cir. 1981).

Clifton moves to dismiss Count Seven because the indictment alleges the Sneeds convinced investors to purchase a membership in the investment groups, not a security. Doc. 75, Mot. Dismiss Indictment, 5. According to Clifton, a membership is not a security as defined by the statute, and so the indictment "does not state an offense under 15 U.S.C. §[]77j(b)." *Id.* at 6. Further, Clifton argues the sale of memberships does not establish the "in connection with" element because the purchase of the membership preceded the sale of securities. *Id.* Therefore, assuming the membership was purchased through fraud, the fraud did not "'coincide[] with the sales' of securities 'themselves.'" *Id.* (quoting *S.E.C. v. Zandford*, 535 U.S. 813, 820 (2002)). In the alternative, Clifton asks the Court to strike all allegations of "misrepresentation[s] or omission[s] that pertain[] to his role in providing financial services, rather than the likely value of purchased securities." *Id.* at 7. Lastly, Clifton argues the alleged misrepresentation that an investment group is "the world market leader" and alleged omission about investors' issues with the investment groups and platforms amount to mere "puffery" or "vague and meaningless allegation[s]" that would subject all marketers to liability or prevent any sale of securities. *Id.*

The Government rebuts by arguing the Sneeds "promoted their scheme" by "claim[ing] they owned an investment platform and could guarantee a specific return, or . . . that they were just a placement company" to guide investors towards particular investments "like cryptocurrency mining." Doc. 79, Gov't's Resp., 6. At other times, the Sneeds "claimed that they were simply selling a 'membership[.]'" *Id.* Further, even if the Sneeds only sold "memberships," the Government alleges

that the Sneeds "forward[ed] international wiring instructions to [investors]" to "aid[] and abet[] in the sale of a security." *Id.* at 7.

Because Clifton presents two separate forms of arguments, the Court addresses each separately below. The Court first addresses the arguments for dismissing the indictment, then addresses the arguments to strike paragraphs of the indictment or find that certain paragraphs only amount to puffery.

### i.   *Clifton's arguments to dismiss the indictment*

Turning to Clifton's first argument—that a membership is not an investment contract—the Court agrees that the memberships do not qualify as a security under the *Howey* framework. While each of the investors invested their own money in a common enterprise with an expectation of profits, the investors expected profits from their individual investments and not from the memberships. *See, e.g., Rice v. Branigar Org., Inc.*, 922 F.2d 788, 791 (11th Cir. 1991) (holding memberships in a country club were not an investment contract because "members bought the memberships to use the club's facilities"). The indictment alleges the Sneeds "directed investors to pay a non-refundable 'investment fee' of up to $20,000.00 in order to become a member" and then the Sneeds allegedly "direct[ed] the investor[s] to wire funds" that "would constitute the 'investment.'" Doc. 1, Indictment, ¶ 16. In effect, the memberships granted an investor entry onto the investment platforms used by the investment groups and the subsequent money wired to the Sneeds by the investors constituted the "investment." Because the investors did not expect any amount of profits from the membership, the membership does not qualify as a security as defined by 15 U.S.C. § 77b(a)(1) and cannot serve as the predicate for an offense under 15 U.S.C. § 77j(b).

However, the Court disagrees with Clifton that the alleged fraud that induced the investors to buy a membership did not "coincide" with the sale of the investments. Clifton cites to *S.E.C. v. Zandford*, 535 U.S. 813 (2002) for this contention. Doc. 75, Mot. Dismiss Indictment, 6. In *Zandford*, the Court reversed the Fourth Circuit's dismissal of wire fraud charges because it found the defendant's inducement of an investor to open an investment account—which the defendant managed and ultimately used to misappropriate funds—was in connection with the purchase or sale of a security. *Id.* at 815–18. The Supreme Court found "[t]he securities sales and [defenda]nt's fraudulent practices were not independent events." *Id.* at 820. Thus, each sale of securities furthered the fraudulent scheme. *Id.*

Several circuit courts, including the Fifth Circuit, "have tried to give dimension to the 'coincide' requirement announced in *SEC v. Zandford.*" *Roland v. Green*, 675 F.3d 503, 512 (5th Cir. 2012), *aff'd sub nom. Chadbourne & Parke LLP v. Troice*, 571 U.S. 377 (2014). The Fifth Circuit has held in the context of the Securities Litigation Uniform Standards Act ("SLUSA") that "a misrepresentation is 'in connection with' the purchase or sale of securities if there is a relationship in which the fraud and the stock sale coincide or are *more than tangentially related*, [is] the best articulation of the 'coincide' requirement." *Id.* at 519–20 (quoting *Madden v. Cowen & Co.*, 576 F.3d 957, 965–66 (9th Cir. 2009)). Congress also "intended 'in connection with' to mean the same thing in SLUSA as it does in Section 10(b)." *Id.* at 512. And since Rule 10b-5[4] establishes a rule for the

---

[4] Section 240.10b-5 ("10b-5") reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

    (a) To employ any device, scheme, or artifice to defraud,

    (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

SEC to enforce § 10(b) and both require the same elements to prove a violation, *SEC v. Sethi*, 910 F.3d 198, 206 & n.4 (5th Cir. 2018), the test applied in the context of SLUSA also applies in the context of Section 10(b) and Rule 10b-5.

The second articulation in *Roland* aptly describes the instant case where the misrepresentations were "more than tangentially related" to the purchase of securities. *See* 675 F.3d at 520. Here, the payment of the membership/investment fee predated the investment in a fund, so any misrepresentations about the membership did not "coincide" with the investment in a fund. *See* Doc. 1, Indictment, ¶ 11 (describing the object of the conspiracy as "causing investors around the country to pay an investment fee . . . [and] investors would then initiate a wire transfer to fund their 'investment.'"). However, the alleged misrepresentations and omissions made by the Sneeds did not disappear after the investors purchased a membership. These alleged misrepresentations and omissions were the impetus for the investors to buy a membership and invest in the funds offered by the Sneeds. Therefore, the alleged misrepresentations and omissions directly relate to the purchase of securities.

ii.   *Clifton's arguments to strike paragraphs in the indictment*

Clifton, in the alternative, asks the Court to strike sub-paragraphs 22(e), (f), and (i) as well as all of Paragraph 23 from the indictment because these references "pertain[] to his role in providing financial services" or amount to mere "puffery." Doc. 75, Mot. Dismiss Indictment, 7. The Court

---

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

construes this alternative argument as a Motion to Strike Surplusage under Rule 7(d) of the Federal Rules of Criminal Procedure.

Under Rule 7(d), a defendant may move for "[a] court [to] strike surplusage from the indictment or information." Fed. R. Crim. P. 7(d). "To strike surplusage, the language in the indictment must be irrelevant, inflammatory, and prejudicial." *United States v. Bernegger*, 661 F.3d 232, 240 n.2 (5th Cir.2011) (citation and internal quotation marks omitted). A court will not strike allegations that are relevant even if they are prejudicial or inflammatory. *United States v. Smallwood*, 2011 WL 2784434, at *10 (N.D. Tex. July 15, 2011).

Sub-paragraph 22(e) alleges that Clifton and Marva "represented that Clifton . . . was a 'Certified Financial Advisor,' 'Certified Estate Planner,' and 'Certified Senior Advisor.'" Doc. 1, Indictment, ¶ 22(e). Sub-paragraph 22(f) alleges that Clifton and Marva "represented that Clifton . . . had a relationship with a famous financial author, and that the author had personally asked him to do seminars. *Id.* ¶ 22(f). Sub-paragraph 22(i) alleges that Clifton and Marva represented that their investment groups "had a 'patented proprietary product' or 'proprietary software' for investment trading." *Id.* ¶ 22(i). And Paragraph 23 includes the following allegations of nine separate omissions made by the Sneeds:

a. Clifton has a final judgment for $1,391,715.83 that also enjoined him "from committing fraud in connection with the offer or sale of any security" in a civil action by the Securities and Exchange Commission from 2006.

b. Clifton has a "Stipulation and Consent Order with the Division of Securities of the Department of Commerce of the state of Utah, admitting that he made material misrepresentations" to investors.

c.  Clifton pleaded guilty to "one count of felony sale of an unregistered security, and one count of felony sale by an unregistered securities agent" in Utah in 2007.

d.  There is a tax lien for $530,322.96 by the Department of the Treasury on all property and property rights of Clifton.

e.  Clifton has a "an Emergency Cease and Desist Order by the Texas State Securities Board" in 2014 to cease and desist offering securities, "acting as a securities dealer or agent, and engaging in any fraud in connection with the offer or sale of any security."

f.  Clifton has "a Cease and Desist [O]rder by the . . . Alabama Securities Commission" to cease and desist "offering or selling any security" in Alabama.

g.  Clifton has "a Cease and Desist and Imposition of Civil Penalties [O]rder by [the] State of Georgia Commissioner of Securities."

h.  The Sneeds concealed Clifton's "true identity by using the name 'Kaisan' Sneed in marketing materials and communications.

i.  Investors experienced "issues" with the investment groups and their investment platforms.

*Id.* ¶ 23.

For the three alleged misrepresentations in Paragraph 22 of the indictment, each one is relevant to the securities fraud charges. Regardless of whether these alleged misrepresentations relate to Clifton's role in "providing financial services," they allege deceit by the Sneeds in the commission of securities fraud. The alleged omissions in Paragraph 23 are also relevant to establishing the elements for a securities fraud violation. *See* 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b-5. Therefore, none of the paragraphs will be stricken from the indictment. Further, a motion to strike is not the appropriate vehicle to remedy vague or indefinite language in the indictment, such as Paragraph

23(i). The remedy for Paragraph 23(i), if any, lies in a bill of particulars and not a motion to dismiss the indictment or motion to strike. *See United States v. Montalvo*, 820 F.2d 686, 691 (5th Cir. 1987) ("The purpose of a bill of particulars is to provide a defendant with more detail about the charges than is provided in the indictment.").

      iii.    *Clifton's arguments to omit puffery in the indictment*

Finally, the Court turns to Paragraph 22(b) of the indictment which alleges Clifton represented that "our binary options platform is the world's market leader in binary options." Doc. 1, Indictment, ¶ 22(b). Clifton argues that a statement about being "the world market leader" amounts to puffery as an opinion and not a statement of fact and the criminalization of such language would "subject[] all of contemporary advertising to liability." Doc. 75, Mot. Dismiss Indictment, 7.

Puffery amounts to statements "of the vague and optimistic type that cannot support a securities fraud action . . . and contain no concrete factual or material misrepresentation." *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 372 (5th Cir. 2004) (citation omitted). It is not "a determinate, verifiable statement about [one's products]" where "[an executive] innocently, got the facts wrong." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184 (2015). Determinations about puffery and opinions are generally left for the jury to decide because they involve mixed questions of law and fact. *See United States v. Blankenship*, 2015 WL 1565757, at *5 (S.D. W. Va. Apr. 8, 2015); *United States v. Plato*, 593 F. App'x 364, 378 (5th Cir. 2015); *United States v. Simpson*, 440 F. App'x 393, 393–94 (5th Cir. 2011); *United States v. Maike*, 2020 WL 2516048, at * 5 (W.D. Ky. May 15, 2020).

The statement that the Sneeds' platform was the "world's market leader" will be left for a jury to decide. Whether an investor would rely on such a statement when making his determination of

- 17 -

whether to invest in the investment groups requires determinations of fact that are ill-suited for a motion to dismiss the indictment. *See Blankenship*, 2015 WL 1565757, at *5 (denying motion to dismiss securities fraud count of the indictment). Accordingly, the Motion to Dismiss Count Seven of the indictment for a failure to state an offense is **DENIED**.

        3.      <u>Nondelegation for Count Seven</u>

Clifton argues that the congressional delegation of rulemaking authority to the SEC is an unconstitutional delegation of legislative power. Article I of the Constitution states that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. CONST. art. I, § 9, cl. 2. Our system of government "mandate[s] that Congress generally cannot delegate its legislative power to another Branch." *Mistretta v. United States*, 488 U.S. 361, 371 (1989).To avoid a nondelegation violation, Congress must provide "an intelligible principle to which the person or body authorized to [act] is directed to conform." *J.W. Hampton, Jr. & Co. v. United States*, 276 U.S. 394, 409 (1928). "[A] nondelegation inquiry always begins (and often almost ends) with statutory interpretation." *Gundy*, 139 S. Ct. at 2123 (plurality opinion). "[I]t is 'constitutionally sufficient if Congress (1) clearly delineates its general policy, (2) the public agency which is to apply it, and (3) the boundaries of that delegated authority." *Big Time Vapes, Inc. v. Food & Drug Admin.*, 963 F.3d 436, 443–44 (5th Cir. 2020) (alterations incorporated) (quoting *Mistretta*, 488 U.S. at 372–73).

Clifton's final argument in the Motion to Dismiss the Indictment is that the delegation of legislative power via § 10(b) of the Securities Exchange Act of 1934 fails to provide an intelligible principle, violating Article I of the United States Constitution. Doc. 75, Mot. Dismiss Indictment, 8. The statute grants far too much power to the SEC to promulgate rules and regulations "in the public interest" which "govern every conceivable sector of the economy," according to Clifton. *Id.*

at 9. Additionally, Clifton contends that this delegation violates a legal tradition of preference for "legislative action in the enactment of criminal offenses." *Id.* at 9–10.

In rebuttal, the Government points to *National Broadcasting Co. v. United States* where the Supreme Court upheld the "public interest" as an intelligible principle. Doc. 79, Gov't's Resp., 8–9. Next, the Government argues that securities laws allow the SEC "and the Department of Justice to hold individuals accountable for taking advantage of unsuspecting victims," which serves the public interest and is therefore, constitutional. *Id.* at 9.

In *National Broadcasting Co.*, the plaintiff challenged eight regulations promulgated by the Federal Radio Commission ("FRC") pursuant to The Communications Act of 1934. 319 U.S. 190, 198–213 (1943). Congress passed the Communications Act in response to the monopolization of the radio spectrum by a few broadcasting stations. *Id.* at 211–14. The intelligible principle guiding the FRC for the "licensing power [was] the public interest, convenience, or necessity." *Id.* at 215 (quotation marks omitted). Additionally, the Commission was required to distribute "licenses, frequencies, hours of operation, and of power . . . as to provide a fair, efficient, and equitable distribution of radio service." *Id.* (quoting 47 U.S.C. § 307(b)). Significantly, context played an essential role in the nondelegation analysis conducted by the Supreme Court. *See id.* at 216–19. Radio airwaves compose a limited range of frequencies, which creates a "natural limitation upon the number of stations that can operate without interfering with one another." *Id.* at 213. Therefore, "the public interest demand[ed] that those who [were] entrusted with the available channels sh[ould] make the fullest and most effective use of them." *Id.* at 218. The Supreme Court upheld the delegation to the FRC because the intelligible principle was "as concrete as the complicated factors for judgment in such a field of delegated authority permit." *Id.* at 216.

The natural limitations associated with radio airwaves are not as prevalent in the context of the sale or purchase of securities. While limited by the availability of capital, securities far exceed the availability of radio airwaves. *See* 15 U.S.C. § 78c(a)(10) (listing the categories of investments that fall within the definition of security). Therefore, the Court declines the Government's suggestion that the Court accept the "public interest" as a catch-all intelligible principle. *See* Doc. 79, Gov't's Resp., 9. The Court will now analyze the statute and regulation in relation to the context of securities.

Section 10(b) delegates to the SEC the power to "prescribe . . . such rules and regulations . . . as necessary or appropriate in the public interest or for the protection of investors" to make unlawful the usage or employment of "any manipulative or deceptive device or contrivance" "in connection with the purchase or sale of any security." 15 U.S.C. § 78j(b). For this statute, the "public interest" or the "protection of investors" provides the intelligible principle to guide the SEC in the promulgation of rules and regulations. *See id.* Section 2 of the Securities Exchange Act of 1934—Necessity for regulation—further elucidates this intelligible principle as:

> a national public interest which makes it necessary to provide for regulation and control of such transactions and of practices and matters related thereto, including transactions by officers, directors, and principal security holders, to require appropriate reports, to remove impediments to and perfect the mechanisms of a national market system for securities and a national system for the clearance and settlement of securities transactions and the safeguarding of securities and funds related thereto, and to impose requirements necessary to make such regulation and control reasonably complete and effective, in order to protect interstate commerce, the national credit, the Federal taxing power, to protect and make more effective the national banking system and Federal Reserve System, and to insure the maintenance of fair and honest markets in such transactions[.]

15 U.S.C. § 78b. Congress found the need for broad regulation to counteract the myriad of issues listed above and others listed within the subparagraphs in the statute.[5] The discussion of the various

---

[5] Paragraph one discusses the relation of security transactions to interstate commerce. *See* 15 U.S.C. § 78b(1). Paragraph two discusses the relation of pricing of securities to valuation and taxation. *Id.* § 78b(2).

issues as well as the elucidation of the need for regulation outlined in the above-quoted paragraph provide a "standard to guide determinations" for the SEC. *N.Y. Cent. Sec. Corp. v. United States*, 287 U.S. 12, 24 (1932).

Pursuant to the "public interest," the SEC promulgated Rule 10b-5 that makes unlawful the employment of "any device, scheme, or artifice to defraud," the making of "untrue statements of a material fact or" the omission of "a material fact," or engaging "in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security." 17 C.F.R. § 240.10b-5. The Rule restates § 10(b) with additional detail of what actions constitute an unlawful manipulation, deception, or contrivance. *Compare* 15 U.S.C. § 78j(b) ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange [t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ."), *with* 17 C.F.R. § 240.10b-5 ("It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement . . . or to omit to state a material fact . . . , or (c) [t]o engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security."). Such a reformulation of a statute as a rule hardly runs afoul of nondelegation principles. *United States v. Pray*, 452 F. Supp. 788, 797 (M.D. Pa. 1978) ("The rule does little more than restate the language of § 78j(b) and is clearly consistent with Congress's intent in passing the

Paragraph three discusses the issue of price manipulation and speculation. *Id.* § 78b(3). And paragraph four discusses the necessity of regulation with respect to national emergencies. *Id.* § 78b(4).

Act that manipulative and deceptive devices be prohibited."); *see also Speed v. Transamerica Corp.*, 99 F. Supp. 808, 831–32 (D. Del. 1951) (finding the language of the prior version of the Act "virtually identical with Rule [10b-5]"). Because § 10(b) delineates a general policy, identifies the SEC as the agency to apply it, and provides boundaries to constrain the SEC, the delegation is constitutionally sufficient. *See Big Time Vapes*, 963 F.3d at 443–44.

Further, the Court finds persuasive the Supreme Court's acceptance in *United States v. O'Hagan* of the legislative delegation in § 10(b) when addressing an interpretative issue with the provision. 521 U.S. 642, 650–51 (1997); *United States v. Vilar*, 729 F.3d 62, 76 (2d Cir. 2013). While the Court did not directly address the delegation question this Court faces today, the Supreme Court found Rule 10b-5 "d[id] not extend beyond conduct encompassed by § 10(b)'s prohibition." *O'Hagan*, 521 U.S. at 651. In other words, and holding true to the instant case, § 10(b) provides sufficient guidance to constrain the SEC's authority in the criminalization of private conduct to not run afoul of nondelegation principles.

To address Clifton's final argument, the Supreme Court has upheld the delegation of writing criminal laws in several contexts. *See Gundy*, 139 S.Ct. 2116, 2130 (upholding delegation to the Attorney General to implement SORNA); *Touby v. United States*, 500 U.S. 160, 169 (1991) (per curiam) (upholding delegation of temporary scheduling power for controlled substances to the Attorney General who delegated to the Drug Enforcement Agency); *Mistretta*, 488 U.S. at 412 (upholding delegation of development of sentencing guidelines to the Judicial Branch). The Court finds this particular delegation gives the SEC the power to "fill up details" in the criminalizing of § 10(b) and not an untethered grant of authority to regulate private conduct. *See Wayman v.*

- 22 -

*Southard*, 23 U.S. 1, 43 (1825). Thus, the Court holds that § 10(b) of the Securities Exchange Act of 1934 does not unconstitutionally delegate legislative authority to the SEC.

C.    *Motion to Exclude Testimony*

Marva moves to exclude prior statements made by Clifton under oath during an interview with the SEC. Doc. 73, Mot. Exclude Test., 1. Marva cites to *Bruton v. United States*, 391 U.S. 123, 126 (1968)*,* and *Richardson v. Marsh*,  481 U.S. 200, 208–09 (1987), as establishing a rule that requires the Government to redact identifying information in Clifton's inculpatory statements to avoid violating her Sixth Amendment "right to confront her codefendant." *Id.* at 2–4. Alternatively, Marva cites to *Ohio v. Roberts* to argue that the testimony is inadmissible hearsay devoid of "indicia of reliability of one of the 'firmly rooted' exceptions." *Id.* at 6–7.

The Government proffers that it will only offer Clifton's statements that implicate Marva if Clifton testifies at trial, but if he does not, the Government will "redact from the SEC's transcript any statements by [Clifton] that implicates [Marva]." Doc. 79, Gov't's Resp., 9 & n.2. Further, the Government contends that Clifton's statements fall within the hearsay exception for an opposing party's statement. *Id.* at 9.

The Court will first provide a brief overview of the relevant cases before turning to address the parties' arguments.

1.    Admission of Clifton's Statements Would Not Necessarily Violate Marva's Sixth
      Amendment Rights

In *Bruton*, the Supreme Court held that that the admission of a defendant's confession in a joint trial, despite a limiting instruction to the jury to disregard the confession when determining the codefendant's guilt, violated the Confrontation Clause of the Sixth Amendment "because of the substantial risk that the jury . . . looked to the incriminating extrajudicial statements in determining

- 23 -

[the codefendant's] guilt." 391 U.S. 123, 126 (1968). The confession in *Bruton* implicated the codefendant by "add[ing] substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination" because the confessing defendant never testified. *Id.* at 128. In certain contexts, "the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored." *Id.* at 135. Thus, "limiting instructions [are not] an adequate substitute for [a defendant's] constitutional right of cross-examination." *Id.* at 137.

The Supreme Court modified the holding from *Bruton* in *Richardson v. Marsh* to allow admission of a defendant's confession with redacted references to a codefendant. 481 U.S. 200, 208–09 (1987). The Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211. When a confession is "not incriminating on its face, and bec[omes] so only when linked with evidence introduced later at trial[,]" admission of the confession does not violate a codefendant's Sixth Amendment rights. *Id.* at 208.

In *Gray v. Maryland*, the Supreme Court added depth to the redaction requirement in *Richardson* by overturning a conviction where the State introduced a redacted confession where "the police detective who read the confession into evidence said the word 'deleted' or 'deletion' whenever [a codefendant's] name appeared." 523 U.S. 185, 188 (1998). Importantly for the Court, the confession "refer[red] directly to the 'existence' of the nonconfessing defendant." *Id.* at 192. Therefore, a redacted confession "that replaces a defendant's name with an obvious indication of

deletion, such as a blank space, the word 'deleted,' or a similar symbol, still falls within *Bruton's* protective rule." *Id.*

Turning to the parties' arguments, the introduction of Clifton's statements during the SEC interview would not necessarily violate Marva's Sixth Amendment rights. The Government stipulated that it will only offer Clifton's statements that implicate Marva if Clifton testifies. Doc. 79, Gov't's Resp., 9. Further, the Government stipulated to redacting any statement that implicates Marva. *Id.* If the Government sufficiently redacts the references to Marva to comply with the holdings in *Bruton*, *Richardson*, and *Gray*, then the Court finds the admission of Clifton's statements would not violate Marva's Sixth Amendment rights.

2.    Clifton's Statements to the SEC Are Admissible Against Only Clifton

In *Ohio v. Roberts*, the Supreme Court analyzed whether a trial court incorrectly admitted the transcript of a witness that was unavailable for trial in violation of the Confrontation Clause. 448 U.S. 56, 59 (1980). The Court analyzed the ways the Confrontation Clause "restrict[s] the range of admissible hearsay." *Id.* at 65. In order to admit an out of court statement, the prosecution must first establish "the unavailability of[] the declarant whose statement it wishes to use against the defendant" and second, that the statement "bears adequate 'indicia of reliability.'" *Id.* at 65–66. Under this reasoning, the Court found the trial court correctly admitted the transcript. *Id.* at 77.

The Supreme Court abrogated the *Roberts* decision, the case relied on by Marva, in *Crawford v. Washington* because of its "unpredictable and inconsistent application." 541 U.S. 36, 66 (2004). After examining the history of the Confrontation Clause, the Court held that "[t]estimonial statements of witnesses absent from trial [are admissible] only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." *Id.* at 59. Testimonial, at

a minimum, applies to "prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68.

Clifton's statements to the SEC most closely resemble "prior testimony . . . to police interrogat[ors]." *See id.* Thus, his statements are testimonial. Clifton also will presumably be unavailable at trial due to his invocation of his Fifth Amendment rights. Doc. 74, Mot. Severance, 1. Therefore, Clifton's statements to the SEC would be inadmissible against Marva because she did not have a prior opportunity to cross-examine Clifton. *See Crawford*, 541 U.S. at 59. Clifton's statements to the SEC are therefore, inadmissible against Marva. However, the Government plans to use Clifton's testimony to the SEC against Clifton. Doc. 79, Gov't's Resp., 9. Therefore, the Court finds Clifton's statements to the SEC admissible if used against Clifton and not Marva.

Thus, the Court **DENIES** Marva's Motion to Exclude Testimony.

D.      *Motion for Severance*

"The default rule is 'persons indicted together should be tried together, especially in conspiracy cases.'" *United States v. Warren*, 728 F. App'x 249, 253 (5th Cir. 2018) (quoting *United States v. Neal*, 27 f.3d 1035, 1045 (5th Cir. 1994)). "Joint trials play a vital role in the criminal justice system . . . ." *Richardson*, 481 U.S. at 209. They promote "the efficiency and the fairness of the criminal justice systems." *Id.* at 210. "[A] district court should grant a severance under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro*, 506 U.S. at 539. Less drastic measures, such as limiting instructions, "often will suffice to cure any risk of prejudice." *Id.* And "juries are presumed to follow their instructions." *Richardson*, 481 U.S. at

211. Fifth Circuit caselaw does not demonstrate a "liberal attitude toward severance." *United States v. McRae*, 702 F.3d 806, 822 (5th Cir. 2012).

Marva first argues that Clifton "may be the only witness . . . [who] could provide exculpatory testimony concerning [Marva's] involvement in the crimes," but he might only testify if the Court severs the trials. Doc. 74, Mot. Severance, 6–7. Marva next contends that a joint trial places her between Scylla and Charybdis, "choos[ing] between testifying in her own defense and possibly inculpating [Clifton] . . . and exercising her marital testimonial privilege."[6] *Id.* at 7. Lastly, Marva avers that evidence of the tax lien against Clifton "may cause the jury to infer knowledge on the part of [Marva] . . . because of the marriage." *Id.*

The Government argues that Marva fails to satisfy the four *Broussard* elements[7] and "fails to show a good faith need for [Clifton's] testimony." Doc. 79, Gov't's Resp., 12. Further, the Government contends that Marva does not allege any exculpatory facts Clifton might provide, because he could not provide any exculpatory testimony without perjuring himself. *Id.* And Marva, the Government argues, also does not establish that Clifton would in fact testify. *Id.* at 12–13. As for the evidence of the tax lien, the Government contends that a limiting instruction would cure any prejudice to Marva. *Id.* at 14–15. Lastly, the Government argues that Marva will have to choose between "(i) testify[ing] in her own defense by inculpating her husband, or (ii) not inculpating her husband, by choosing not to testify in her own defense" regardless of whether she is tried with Clifton or separately. *Id.* at 16.

---

[6] The adverse spousal testimonial privilege prevents the compulsion of one spouse testifying against the other spouse; the privilege is held by the testifying spouse. *Trammel v. United States*, 445 U.S. 40, 52 (1980).

[7] The *Broussard* elements are "(1) a bona fide need for the testimony; (2) the substance of the testimony; (3) its exculpatory nature and effect; and (4) that the co-defendant would in fact testify if a severance was granted." *Broussard*, 80 F.3d at 1037.

The Court addresses each of Marva's arguments separately below.

1.    Marva Fails to Establish the *Broussard* Elements for Severance Based Upon Exculpatory Testimony

Marva fails to establish at least three of the *Broussard* elements. First, Marva does not provide the substance of Clifton's testimony. Marva merely avers that Clifton "could provide exculpatory testimony." Doc. 74, Mot. Severance, 1, 6. Without knowing the substance of the testimony, the Court cannot evaluate the need for or nature of the testimony. *See United States v. Williams*, 809 F.2d 1072, 1084 (5th Cir. 1987) (noting the motion contained only conclusory statements about the exculpatory nature of codefendants testimony). Second, Marva never explains the exculpatory nature and effect of Clifton's possible testimony other than to say that "Clifton would voluntarily testify on [Marva]'s behalf." *Id.* at 7. Third, Marva fails to establish that Clifton would in fact testify on her behalf. Marva asserts varying degrees of Clifton's willingness to testify, ranging from a belief that he would testify to confirmation that he will testify. *Id.* at 1, 6–7. Such varying degrees support little more than an inference that Clifton would testify if the Court granted a severance, which fails to meet the burden that Clifton would in fact testify. *See Williams*, 809 F.2d at 1084 (finding an affidavit signed by the defendant's counsel and not the codefendant insufficient to establish that codefendant would in fact testify); *United States v. Rocha*, 916 F.2d 219, 232 (5th Cir. 1990) (finding a signed affidavit by the codefendant did not meet the burden of establishing the codefendant would in fact testify). Therefore, Marva fails to establish a need for severance based upon exculpatory testimony.

2.    Choosing Between a Privilege and Right Does Not Warrant Severance

Turning to Marva's argument concerning her decision of whether to assert the adverse spousal testimonial privilege or testify in her defense, the Court finds Marva faces a choice, but not an unconstitutional one. Marva cites to *United States v. Blunt* as an example where a court found

severance warranted when "one spouse must decide between testifying adversely against her spouse in her own defense or exercising her privilege against adverse spousal testimony." 930 F.3d 119, 127 (3d Cir. 2019). In *Blunt*, a husband and wife were tried jointly for mail fraud, money laundering, aggravated identity theft, conspiracy to commit mail fraud, and conspiracy to commit money laundering. 930 F.3d at 121. The wife chose to testify at trial, but "[h]er testimony was curtailed in an attempt to prevent the jury from hearing prejudicial statements against [her husband]." *Id.* at 128. The court found the prohibited testimony probative to her defense of duress. *Id.* In sum, the wife in *Blunt* was unable to exercise either constitutional right[8] "in a satisfactory manner." *Id.*

While Marva "must decide between testifying adversely against her spouse in her own defense or exercising her privilege against adverse spousal testimony," Marva does not face an unconstitutional obstacle to presenting her defense. *See Blunt*, 930 F.3d at 127. Importantly, the adverse spousal testimony privilege is not a fundamental right. *United States v. Ferrer*, 2008 WL 4890034, at *3 (M.D. Pa. Nov. 12, 2008). Having to choose between asserting a privilege that implicates no constitutional right and the right to testify does not run afoul of any Sixth Amendment constitutional guarantees. *See United States v. Freeman*, 694 F. Supp. 190, 191–92 (E.D. Va. 1988) ("If a criminal defendant may be required to choose his right to testify over his [F]ifth [A]mendment right to avoid self-incrimination, surely a defendant may be required to make a choice between her right to testify and her option to assert a privilege that implicates no constitutional right." (citation omitted)). Marva can decide to exercise her marital testimonial privilege and not testify, or to testify in her own defense and inculpate Clifton. *Cf. United States v. Binns*, 2007 WL 120706, at *8 (E.D.

---

[8] The Court in *Blunt* refers to the privilege against adverse spousal testimony as both a privilege and a right. 930 F.3d at 128. The privilege against adverse spousal testimony is a privilege and not a constitutional right. *See Trammel*, 445 U.S. at 41–42.

Mo. Jan. 11, 2007) (holding defendant's assertion that she "may" testify if granted severance as speculative). Further, unlike in the *Blunt* case, Marva has not shown how her anticipated defense would prejudice Clifton and that the Court would be required to curtail her testimony to prevent such prejudice. 930 F.3d at 128. Therefore, the conflict between the right to testify and this privilege do not warrant severance for Marva. *See United States v. Artates*, 2012 WL 6597752, at *2 (D. Haw. Dec. 18, 2012) ("The majority of courts faced with the issue before this Court have denied severance."); *United States v. Taggart*, 2008 WL 2705109, at *5 (E.D. Ark. July 8, 2008) (collecting cases of joint trials of husband and wife).

  3.   Limiting Instructions Will Prevent Prejudice to Marva from Any "Spillover Effect"

Marva's final argument hinges on the "spillover effect" from some of the evidence to be presented against her husband Clifton. In the Fifth Circuit, "when one conspiracy exists, severance is not required, even where the quantum and nature of the proof in each case is different, so long as the trial court repeatedly gives cautionary instructions." *Rocha*, 916 F.2d at 228. Limiting instructions provide the proper remedy for confining "spillover" evidence. *United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir. 1985).

"[T]he question is whether the jury can separate the evidence and give independent consideration to the charges against each Defendant." *United States v. Ferrera*, 1995 WL 355696, at *2 (N.D. Ill. June 12, 1995). Evidence of the prior SEC enforcement actions and the tax lien against Clifton will not pose a threat of prejudice for Marva because the Court will instruct the jury to consider only the appropriate evidence for each defendant. *See United States v. Cash*, 2014 WL 6633046, at *4 (N.D. Tex. Nov. 24, 2014) (finding no threat of "guilt[] by association" from "more damaging evidence . . . presented against one defendant than [the other]"). The Fifth Circuit has

upheld the denial of severance when one defendant had far more damaging evidence presented against them than the evidence here. *See United States v. Harrelson*, 754 F.2d 1153, 1175 (5th Cir. 1985) (upholding the denial of severance when evidence against one defendant included a "prior criminal record, . . . reputation as a murderer for hire, and . . . extraordinarily unsavory character"). Even more to the point, the Fifth Circuit has stated that "neither a quantitative disparity in the evidence nor the presence of a spillover effect requires a severance." *United States v. Ledezma-Cepeda*, 894 F.3d 686, 690 (5th Cir. 2018) (quoting *United States v. Krout*, 66 F.3d 1420, 1430 (5th Cir. 1995)). Based on the evidence of this case, a jury could "separate the evidence and give independent consideration to the charges against each [d]efendant." *See Ferrera*, 1995 WL 355696, at *2. Thus, the Court finds the risk of prejudice to Marva not so great that a limiting instruction could not avoid any spillover of evidence onto Marva.

## IV.

## CONCLUSION

For the foregoing reasons, Defendant Marva Sneed's Motion for Joinder to the Motion to Dismiss the Indictment (Doc. 76) is **GRANTED**. Defendant Marva Sneed's Motion to Exclude Testimony (Doc. 73), Motion for Severance (Doc. 74), and Defendant Clifton Sneed's Motion to Dismiss the Indictment (Doc. 75) are **DENIED**.

SO ORDERED.

SIGNED: January 3, 2022.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE